

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CR-13-316

| | |
|---|---|
| | Opinion Delivered October 21, 2015 |
| ANTWAN FOWLER **APPELLANT** | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. CR-2011-1160] |
| V. | |
| STATE OF ARKANSAS **APPELLEE** | HONORABLE DAVID L. REYNOLDS, JUDGE |
| | AFFIRMED |

## BRANDON J. HARRISON, Judge

Antwan Fowler appeals his first-degree murder conviction and argues that the circuit court erred in (1) denying his motion for directed verdict, (2) not allowing certain questions during the defense's cross-examination of Dr. Frank Peretti, (3) not allowing the defense to call Dr. Peretti as a witness in its case-in-chief, and (4) enhancing Fowler's sentence based on use of a firearm. We affirm.

In a felony information filed 23 September 2011, Fowler was charged with first-degree murder and employing a firearm in the commission of the crime. He was also later charged as a habitual offender. At a jury trial held in September 2012, the State presented the following testimony.

Jodi Thomas testified that her husband, Stevie Thomas, was killed on Monday, 20 June 2011. She testified that she had attended high school with Fowler but that her husband

and Fowler were not close friends. Jodi explained that on June 17, the Friday before her husband was killed, he spoke to Fowler on the phone and had the call on speaker. Accordng to Jodi, Fowler was "screaming and cursing and he told Stevie, 'Don't put the folks in it, it is on, on shot.'" Jodi testified that Stevie was very upset and felt threatened by the conversation. She testified that they stayed home for most of the weekend, which was Father's Day weekend, but that on June 19, Stevie and his brother, Kenny Thomas, went to visit their father's grave and then went to a get-together at "Uptown E's House." She explained that they drove her vehicle, a white 2001 Galant, and that there was a .45-caliber handgun in her car that she kept for her own protection. She testified that when her car was returned to her after her husband's death, the gun was missing, and she eventually reported it stolen.

Pam McFarland testified that she lived at 1120 Ingram and that she and her boyfriend, Eric, had a barbeque for Father's Day on 19 June 2011. She explained that the barbeque lasted all day and into the night and that there were probably twenty people there at any given time. She testified that she knows Stevie and Kenny Thomas but did not see them that night. She also testified that she knows Fowler and did see him walk by the front of the house that night. McFarland testified that, at some point that evening, she went inside and fell asleep but awoke to loud noises that she thought were fireworks. She explained that she went to the door and saw several people kicking another person who was lying on the ground. She identified Fowler as the person on the ground and stated that it looked like he had been shot. She saw several people get into Kenny Thomas's car and drive away.

Montana Wright, McFarland's seventeen-year-old daughter, testified that she was also inside the house when she heard shots that sounded like firecrackers—four shots in quick succession, and then more shots later. She also looked outside and saw people kicking someone on the ground. She did not see anyone with a gun that night.

Sixteen-year-old April Yager testified that she was staying with her friend Montana Wright that night and that she was also inside when she heard the shots. She testified that she saw a man sitting in a white car in front of the house and that she "guess[ed] he got shot." When asked why it was a guess, Yager stated that she was told that by the police. She acknowledged talking to Detective Sarah Ault with the Conway Police Department but insisted that she (Yager) said only what the police wanted her to say.

PROSECUTOR: So your testimony to this jury today that you were coming out and we were just standing there, coming out of the house, and you started hearing all the popping, so you turned back around and that's when I seen a guy walk up and that's when I turned around, he was walking up and I turned around, I saw him crack his door and that's when it started going." [sic] You don't remember saying any of that?

YAGER: I just told you that's what she told me I saw.

PROSECUTOR: You did say that to her; is that right?

YAGER: Sure, yeah.

PROSECUTOR: Are you denying that you said that to her?

YAGER: I couldn't deny it if you have it, but I'm telling you that she told me that I was outside when I told her I was inside.

PROSECUTOR: And so when you said, when she asked you: "He had shot at somebody in the car in the driver's seat?" And

you said, "Yeah the guy was sitting in the car."  So you told her that because you thought she wanted you to say?

YAGER:  That is what she wanted me to say. . . . I agreed with her because I wanted to go back in the house.

PROSECUTOR:  So you just lied to her and made that up?

YAGER:  Yes sir.

PROSECUTOR:  So when you said he shot at the guy in the driver's seat, that was made up?

YAGER:  Yes sir.

PROSECUTOR:  And you said, "I knew that they were shooting at each other because I heard popping and so I turned around and heard a popping and I seen the flashes.["] You just made that up?

. . . .

PROSECUTOR:  Ms. Yager, it is also fair to say that you have said that the person sitting in the car was not the first person to shoot, right?

YAGER:  Yes sir.

PROSECUTOR:  And is that just made up?

YAGER:  That's what she told me happened.

. . . .

PROSECUTOR:  Ms. Yager, you would agree that you also told, because she told you what to say, that the person that started firing was the person that ended up on the ground, isn't that right? That's what you told Detective Ault, right?

YAGER:  He —

PROSECUTOR:  Because the person that started shooting first was the person that ended up on the ground.  Do you remember saying that, don't you?  I mean, I know that

you are saying that you didn't see that, but you agree you said that?

YAGER:      I don't remember saying that.

Detective Sarah Ault testified that she responded to the crime scene at 1170 Ingram Street. She explained that she interviewed witnesses and found that most of them "appeared to not want to get involved." She also described a few witnesses as "evasive, not wanting to cooperate." She recalled speaking to April Yager inside the house and asking her to write a statement. After Yager refused, Ault spoke with her privately and secretly recorded their conversation.[1] She denied ever telling Yager what to say or relaying details about the crime. She also confirmed that no handguns had been found at the scene. On cross-examination, she explained that there was a second crime scene nearby involving a one-car accident at the corner of Caldwell and Locust, and that Stevie and Kenny Thomas had left the Ingram Street crime scene in that car.

Sergeant Gene Hodges testified that he responded to a suspicious-person call on 20 June 2011 near Ingram Street and, while checking the area, heard the gunshots. Hodges explained that he and his partner heard a series of shots, then more shots, and that he could tell that there were two weapons fired because one sounded different than the other. He stated it sounded like a smaller caliber was fired first, then a larger caliber. They immediately received a call to respond to Ingram Street and arrived within a minute. Hodges observed a person lying between two cars, later identified as Fowler, and tried to speak with him, but

---

[1]This conversation, which is apparently what the prosecutor was quoting during Yager's direct examination, was not admitted into evidence.

Fowler was not coherent. Hodges explained that Fowler was wounded in his upper head and face area.

Officer Andrew Johnson testified that he also responded to Ingram Street and observed Fowler lying on the ground with an apparent gunshot wound to his head. Johnson observed a significant amount of blood on the ground and several shell casings.

Detective Bradley Fornash testified that he responded to the scene of the one-car accident and that the vehicle appeared to be traveling away from Ingram Street toward Conway Regional Hospital. His investigation revealed that Stevie and Kenny Thomas had been the occupants of the vehicle.

Dr. Frank Peretti, a forensic pathologist and medical examiner at the Arkansas State Crime Lab, testified that he examined the body of Stevie Thomas. Dr. Peretti stated that Thomas had three gunshot wounds—to his chest, thigh, and arm—and that the wound to his chest was the fatal wound. Thomas also had superficial wounds from the car accident.

Latricia Mainard, a paramedic at MEMS Ambulance Service, testified that she responded to Ingram Street, where Fowler was in critical condition with wounds to his head and abdomen.

Detective Jason Cameron testified that he responded to the shooting at Ingram Street and that he recovered seven shell casings from two different calibers of guns—five from a .40 and two from a .45. He testified that one of the .45-caliber shell casings was found inside Thomas's Mitsubishi Galant, along with a bullet fragment from the windshield post and a bullet in the driver's seat. Cameron also identified photographs of bullet holes in the hood and windshield of the Galant and blood stains inside the Galant.

Joseph Hoff, a forensic-DNA analyst with the Arkansas State Crime Laboratory, testified that blood samples taken from the Galant and the driveway at 1170 Ingram Street belonged to Stevie Thomas.

After the State rested, the defense moved for a directed verdict, arguing that the State had failed to prove that Fowler purposely caused the death of Stevie Thomas. The defense argued that no one had seen Fowler in possession of a gun or seen him shoot Thomas. The motion was denied. The defense rested without calling additional witnesses and renewed the motion, which was denied. The case was sent to the jury, which found Fowler guilty of first-degree murder and employing a firearm as a means of committing first-degree murder. Fowler was sentenced to sixty years' imprisonment for first-degree murder with an additional fifteen years' imprisonment for the firearm enhancement.

We first address Fowler's challenge to the sufficiency of the evidence. Although Fowler presents his challenge to the circuit court's denial of his motion for directed verdict as his third point on appeal, we must address such a challenge first for purposes of double jeopardy. *See Woolbright v. State*, 357 Ark. 63, 160 S.W.3d 315 (2004). This court treats a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Gwathney v. State*, 2009 Ark. 544, 381 S.W.3d 744. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State, consider only the evidence that supports the verdict, and affirm if substantial evidence exists to support the verdict. *Id.* Substantial evidence is that evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Campbell v. State*, 2009 Ark. 540, 354 S.W.3d 41.

A person commits first-degree murder if, with a purpose of causing the death of another person, the person causes the death of another person. Ark. Code Ann. § 5-10-102(a)(2) (Repl. 2013). A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). Intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Taylor v. State*, 77 Ark. App. 144, 72 S.W.3d 882 (2002). A presumption exists that a person intends the natural and probable consequence of his acts. *Bell v. State*, 99 Ark. App. 300, 259 S.W.3d 472 (2007).

Fowler argues that the evidence in this case showed that he was attending a Father's Day celebration in his neighborhood when, without provocation, he was shot by the decedent multiple times. He asserts that there is no evidence in the record that he possessed a weapon or threatened the decedent. He also contends that none of the State's witnesses testified that they saw Fowler harm, attempt to harm, or threaten to harm the decedent.

In response, the State argues that the evidence demonstrated that shots were fired from two different guns that night: five .40-caliber bullets were fired toward the decedent's vehicle, and two .45-caliber bullets were fired from the decedent's vehicle toward Fowler. According to the State, the evidence also showed that the five shots were fired first, by Fowler, and that the decedent fired back in self-defense. The State contends that "[t]he jury could reasonably infer from the testimony of the witnesses, combined with photographs taken and evidence gathered from the crime scene, that Appellant purposely caused the

death of Steve Thomas by firing five shots at him from a .40-caliber gun which struck the vehicle, and inflicted the fatal wounds."[2]

We affirm. Contrary to Fowler's assertion, there was evidence that Stevie Thomas felt threatened by Fowler, that Fowler fired shots toward Thomas while he was sitting in his wife's car, and that Thomas retaliated by firing shots toward Fowler. We hold that there was substantial evidence for the jury's verdict without resorting to speculation or conjecture.

Next, Fowler argues that the circuit court erred in not allowing certain questions during the defense's cross-examination of Dr. Peretti. Prior to trial, the State moved to exclude the results of a toxicology screen performed by Dr. Peretti on the decedent, which revealed the presence of alcohol, cannabis, and cocaine. The State argued that the results were prejudicial and not relevant. After noting that Fowler was pleading general denial as a defense, the court agreed that the toxicology report was not relevant and should be suppressed. The court did agree, however, that "[i]f they become relevant later, you know, I can change that ruling."

During defense counsel's cross-examination of Dr. Peretti, she asked him if he had run pathology reports on the decedent, which prompted an objection by the State. The State argued that the court had already ruled that the report and its results were not allowed. Defense counsel argued that the report was relevant because it was part of the overall autopsy report, which was relied on by the State in deciding to bring charges against Fowler.

---

[2]In his reply brief, Fowler denies that there was any evidence that he purposely caused the death of the decedent and disputes the evidence cited by the State. However, because this argument is raised and developed for the first time in his reply brief, we do not consider it. *Hinton v. State*, 2010 Ark. App. 341.

Counsel also asserted that the presence of toxins in the body might have affected the speed and trajectory of the bullets. Counsel insisted that the defense had the right to cross-examine Dr. Peretti on every aspect of the report he had prepared, even though the report was not introduced into evidence.

After the court sustained the State's objection, defense counsel attempted to introduce the autopsy report herself, to which the State objected because (1) it was a prior consistent statement, and (2) the court had already ruled that some of the information in the report, specifically the toxicology screen, was prejudicial and irrelevant. The State argued that because Fowler's defense was a general denial, the presence of intoxicants in the victim's system was irrelevant. The court sustained the State's objection, and defense counsel argued that the court was "restricting Mr. Fowler's rights to confrontation." The court responded that defense counsel could ask Dr. Peretti "about his findings on relevant issues that were brought up . . . in direct examination. You have that right, but you don't have the right to introduce the irrelevant information and just because he produced it [the report] doesn't mean it is relevant."

On appeal, Fowler again argues that the autopsy report, specifically the toxicology report, was relevant. He argues that an inquiry into the "material issues" surrounding the victim's intoxication "[was] necessary in order to challenge the cause of death." This is especially so, he argues, "[g]iven that there is credible evidence that suggests that the decedent may have died from either drug poisoning or the injuries he sustained during his

SLIP OPINION

car accident." Fowler assserts that in limiting his cross-examination of Dr. Peretti, the circuit court violated his Sixth Amendment right to confrontation.[3]

In response, the State argues that Fowler failed to obtain a ruling on any constitutional argument and that the circuit court did not err in finding that the results of the toxicology report were irrelevant. In his reply brief, Fowler asserts for the first time that he was denied the right to ask questions about the reliability of the autopsy report. This argument is both incorrect and raised for the first time in the reply brief, so it will not be addressed. *See Hinton, supra.*

Evidentiary rulings are a matter of discretion and are reviewed only for abuse of that discretion. *Gilcrease v. State*, 2009 Ark. 298, 318 S.W.3d 70. While an accused is accorded wide latitude in cross-examination to impeach the credibility of a witness against him, the circuit court may also impose reasonable limits on what testimony is admitted based upon concerns about harassment, prejudice, waste of time, confusion of issues, or interrogation that is repetitive or only marginally relevant. *Id.*, 318 S.W.3d 70.

We hold that the circuit court did not abuse its discretion in this instance. Given Fowler's defense of general denial, the circuit court was correct in finding the victim's toxicology report irrelevant. *See Arnett v. State*, 2010 Ark. App. 702 (holding that victim's toxicology report was not relevant when defendant claimed he accidentally killed the

---

[3]Fowler also mentions the court's limiting his cross-examination of the paramedic, Latricia Mainard, but his argument focuses on Dr. Peretti, so Mainard's cross-examination will not be discussed. *See Hendrix v. State*, 2011 Ark. 122 (failure to develop an argument precludes review of the issue on appeal). Fowler also argues that the circuit court erroneously held that the autopsy report was inadmissible under the business-records exception to hearsay, but because we cannot find such a ruling in the record, this argument will not be addressed.

victim). And, contrary to Fowler's assertion, there was no credible evidence upon which to challenge the cause of death. Dr. Peretti explained unequivocally that the "cause of death is self-evident, you've got multiple gunshot wounds." And Fowler received no ruling on any Confrontation Clause argument so we need not address it. *See Lewis v. State*, 2014 Ark. App. 136, 432 S.W.3d 145 (failure to obtain a ruling on an issue at the trial court level, including a constitutional issue, precludes review on appeal).

Fowler also argues that the circuit court erred in not allowing the defense to call Dr. Frank Peretti as a witness in its case-in-chief. At the conclusion of Dr. Peretti's testimony during the State's case-in-chief, defense counsel stated that she had no more questions but requested that Dr. Peretti "remain under subpoena to be called possibly after testimony from the other persons" at the State Crime Lab. Dr. Peretti explained that he would be traveling to Mena the next day, and the court stated, "I'm not sure we'll need you tomorrow." Defense counsel again asked whether Dr. Peretti would be under subpoena power, to which the court responded, "Yes, he will be, you will be under call."

The next day, after the State rested, defense counsel announced that she would like to call Dr. Peretti as a witness. The State objected and argued that "it is discretionary with the Court whether or not she gets to call the witness. The only questions she is going to ask the witnesses [sic] are questions we have already gone over and have been asked and answered." The court noted that Dr. Peretti had been available the previous day and that defense counsel had an opportunity to cross-examine him. The court questioned what additional testimony from Dr. Peretti would be relevant, and defense counsel explained, "Our purpose is to call Dr. Peretti to explore specifically about some findings in his report

that come from some of the testimony reference the bullets, bullet fragments that were testified to by the analyst today." The court responded that those questions had been asked the previous day, but defense counsel insisted that they were not the same questions and that she had additional questions.

After a lunch recess, the bench conference continued, and the State objected to calling Dr. Peretti based on Ark. R. Evid. 611, which allows the court reasonable control over the mode and order of interrogating witnesses and presenting evidence. The State argued that Dr. Peretti had been subject to extensive direct examination and cross-examination on all the issues contained in his report and that there was no additional relevant testimony that had not already been elicited from Dr. Peretti. Defense counsel contended that she had questions for Dr. Peretti that could not be asked on cross-examination and that "go directly towards whether Mr. Fowler caused the death of Stevie Thomas." The following exchange then took place:

THE COURT: If you don't give me some indication of what Dr. Peretti is going to testify to today, that he did not testify to yesterday or you did not have an opportunity to ask yesterday, then I'm going to rule that your—his testimony is not relevant, that it is a waste of time because it is going to cause this case to be delayed another day and that's within my discretion.

DEFENSE COUNSEL: And again, then the Court is making the decision that— has taken the position that Defense counsel cannot call a witness for direct examination and I am just asking that the Court—

THE COURT: Not when it results in a one-day delay.

DEFENSE COUNSEL: Well, Your Honor, again—

13

THE COURT:        Because you knew yesterday that he couldn't be here today.

. . . .

DEFENSE COUNSEL: I only dealt with their direct examination is the main intent. I only dealt with that. I was limited in cross. I can't ask direct questions.

THE COURT:        You were not limited.

DEFENSE COUNSEL: Oh yes, I can only—it is only limited to that which was asked on direct.

THE COURT:        Not one statement did anyone have an objection to you going into anything that was not covered on direct.

DEFENSE COUNSEL: They absolutely did make objections to things that specifically a toxicological reports [sic] weren't in there.

THE COURT:        That's right.

DEFENSE COUNSEL: There were other things that they did not address on direct that I want to address on my direct and we want to call him as a witness so that I can address those issues from their report and based on some of the testimony that was given today. I want to ask him direct questions about his findings based on I [sic] information and it did not come out on direct. And it couldn't come out in cross because cross is limited to that which comes out on direct.

THE COURT:        I am going to deny your motion.

Defense counsel later proffered that Dr. Peretti "would have testified specifically as to the specific findings of the toxicological reports and their relevance to what may have been or contributed to Stevie Thomas'[s] death." Counsel also proffered the autopsy report and the toxicology report into evidence.

On appeal, Fowler asserts that the circuit court violated his Sixth Amendment right to present witnesses to establish a defense when it failed to compel Dr. Peretti's attendance during the defense's case-in-chief or to continue the trial until Dr. Peretti was available. Fowler also argues that Dr. Peretti "inculpated" him and that he (Fowler) was "deprived of the opportunity to refute certain material allegations . . . that Dr. Peretti advanced during the State's case in chief." Fowler contends that the State had a duty to assist the defense in securing Dr. Peretti's presence and that the circuit court should have granted a continuance.

Contrary to Fowler's argument on appeal, he failed to argue below that denying his request to call Dr. Peretti during the defense's case-in-chief violated his Sixth Amendment rights, nor did he request a continuance when it was clear that Dr. Peretti was unavailable to testify. Therefore, these arguments are not preserved for our review. *See Lewis*, *supra*. Also, Fowler's contention that he was "inculpated" by Dr. Peretti is completely baseless; we can find no evidence of this in the record, and he (Fowler) has failed to provide a citation to either the abstract or the record to support this contention. Moreover, Dr. Peretti made it very clear that he did not know who shot Stevie Thomas and that, as a forensic pathologist, he was concerned only with how death occurred, not who did it or why they did it. We therefore affirm on this point.

Fowler's final argument is that the circuit court erred in enhancing Fowler's sentence based on use of a firearm. Arkansas Code Annotated section 16-90-120(a) (Repl. 2013) provides as follows:

> Any person convicted of any offense that is classified by the laws of this state as a felony who employed any firearm of any character as a means of committing or escaping from the felony, in the discretion of the sentencing

court, may be subjected to an additional period of confinement in the state penitentiary for a period not to exceed fifteen (15) years.

In this case, the jury found that Fowler employed a firearm as a means of committing first-degree murder and recommended an additional sentence of fifteen years' imprisonment.

On appeal, Fowler argues that the State failed to prove that he used a firearm to kill the decedent. He asserts that no witness testified that he possessed a firearm or that he shot the decedent and that the State failed to produce the firearm allegedly used by Fowler to shoot the decedent. However, because we are affirming Fowler's conviction for the first-degree murder of Stevie Thomas, and Thomas was killed by multiple gunshots wounds, we hold that there is no merit in Fowler's argument that there was no proof that he used a firearm to kill the decedent.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Teresa Bloodman*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Eileen W. Harrison*, Ass't Att'y Gen., for appellee.